UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAVID A. FALCON,

Plaintiff,

v.

CRAIG KOENIG, et al.,

Defendants.

Case Nos. 22-cv-06978-PCP
23-cv-03203-PCP
24-cv-02725-PCP

**ORDER DENYING SUMMARY JUDGMENT MOTIONS AND REFERRING RELATED CASES TO THE MEDIATION PROGRAM**

Re: Dkt. Nos. 35, 42 in Case 22-cv-06978-PCP; Dkt. No. 50 in Case 23-cv-03203-PCP; Dkt. No. 35 in Case 24-cv-02725-PCP

This order concerns summary judgment motions filed in three cases: *Falcon v. Koenig*, Case No. 22-6978-PCP (N.D. Cal. filed Nov. 8, 2022) ("*Falcon*"); *Serrato v. Allison*, Case No. 23-cv-3203-PCP (N.D. Cal. filed June 27, 2023) ("*Serrato*"); and *Perez v. Macias*, Case No. 27-cv-2725-PCP (N.D. Cal. filed May 5, 2024) ("*Perez*"). The Court previously concluded that these three cases were related within the meaning of Civil Local Rule 3-12. *See* Dkt. Nos. 31, 47.[1]

A summary judgment motion was filed in each case. *See* Dkt. No. 35; *see also Serrato* Dkt. No. 50, *Perez* Dkt. No. 35. In *Falcon*, new evidence was presented in defendants' reply. *See* Dkt. No. 40 at 3–4. Mr. Falcon filed a motion for leave to file a sur-reply, *see* Dkt. No. 42, which is **GRANTED**. In *Serrato* and *Perez*, this new evidence was presented in the summary judgment motions and those plaintiffs had the opportunity to address that evidence in their oppositions.

For the reasons stated below, the Court **DENIES** the pending summary judgment motions. The Court refers the three related cases to the *Pro Se* Prisoner Mediation Program.

---

[1] For simplicity, record citations are to the *Falcon* docket unless otherwise noted.

United States District Court
Northern District of California

United States District Court
Northern District of California

**Background**

At all relevant times, plaintiffs Falcon, Serrato, and Perez were incarcerated at the Correctional Training Facility ("CTF") in Soledad, California.

All three plaintiffs name as a defendant C. Koenig, the warden of CTF during the events in question. Mr. Falcon additionally sues CTF correctional employees Binning, Glaze, Handley, Lopez-Ortega, Macias, McDonald, and Marquez. In addition to defendant Koenig, Mr. Perez sues CTF correctional employees Binning, Freeman, Handley, Lopez, Macias, and Sirwet. Mr. Serrato additionally sues K. Allison, the secretary of the California Department of Corrections and Rehabilitation during the events in question.

In March 2019, Mr. Falcon was validated as a member of the security threat group ("STG") Sureños. Compl. at 9; MSJ at 8. Mr. Serrato and Mr. Perez are not known to be affiliated with any STG. *Serrato* MSJ at 9; *Perez* MSJ at 3.

In May 2021 at CTF, conflicting STGs were given yard access at different times to reduce the risk of violence between STGs. MSJ at 2. Defendants explain that Fresno Bulldogs "were placed into 'Group II'" of inmates being given time in the prison yard, and rival STGs such as the Sureños were placed in Group I. *Id*. at 9. "During the relevant May 2021 time period, Group I and Group II inmates did not share yard time together." *Id*. Inmates not affiliated with any STG were not subject to this policy and could access the yard at either time.

On May 24, 2021, CTF staff received a tip that, on the following day, "the Bulldogs intended to attack any inmate who was not Black or Asian." Reply at 3. Defendants explain that an anonymous caller provided this tip to non-defendant Sergeant Vera. *See id*. At 12:51 p.m. local time that same day, Sergeant Vera reported this tip via email to defendants Binning and Handley. *See id*.; *see also* Dkt. No. 40-1 (containing the email from Sergeant Vera to defendants Binning and Handley). Specifically, Sergeant Vera stated in his email to defendants Binning and Handley that "an anonymous caller" had warned the Fresno "Bulldogs [were] possibly planning an attack on inmates who are not black or Asian during the release tomorrow." *Id*.

On that same day, defendant Binning directed non-defendants Reed and De La Torre to "[w]ork with ISU and complete some influential inmate interviews" and "[r]eport all findings to

2

[defendant Binning] by 1600 hours." *Id*. The email copied defendant Handley and is marked "8:13:51 PM (UTC)," so it appears to have been sent at 1:13 p.m. local time. *See id*. Less than an hour later, non-defendant Reed responded to state that he and defendant McDonald had "met with the ZW/Bulldog IAC this morning at approximately 0730." *Id*. Defendants explain that this meeting was with "leaders of the Bulldog prison gang." Reply at 3. Those gang leaders "assured Reed and McDonald that they were aware of the yard release scheduled for the next day and did not foresee any issues." *Id*.; *see also* Dkt. No. 40-1. There is no indication that the Bulldog gang leaders were re-interviewed after CTF staff received the anonymous tip. *See generally* Reply & Dkt. No. 40-1; *see also Serrato* MSJ *and Perez* MSJ.

On May 25, 2021, the Fresno Bulldogs were given yard time in accordance with CTF's standard plan. *See* Compl. at 9. Sureño-affiliated Mr. Falcon and unaffiliated Mr. Serrato and Mr. Perez were released into the yard even as "Bull Dog Inmates were positioned . . . in a siege formation, yelling and making dog bark sounds … ready for an attack." *Id*. at 11. Correctional officers stood nearby in riot gear, and several gurneys were positioned nearby. *See id*. As the non-Bulldog inmates entered the yard, "the large crowd of Fresno Bull Dog Inmates charged at [Mr. Falcon] and other E-wing inmates." *Id*. at 11–12. Correctional officers moved out of the yard, "closed and locked the yard gate entrance behind" themselves, and a riot ensued in which all plaintiffs were injured. *Id*. at 12.

Defendants argue in their summary judgment motion that they "did not have advance notice of the riot … did not know that [Mr. Falcon] … was in the group of people who went to the yard, and were not directly involved with releasing [Mr. Falcon] from his cell." *Id*. Specifically, defendants argue in the summary judgment motion that defendant "Koenig did not hear from [the tipster] before the May 25, 2021, riot, or at any time thereafter," and "did not receive any message from prison staff indicating [the tipster] had contacted them and is not aware of any advance notice to himself or prison staff, directly or indirectly, that a riot would take place on May 25, 2021." *Id*. at 10. Other defendants make similar representations. *See id*. at 10–11.

### Legal Standard for Summary Judgment

Summary judgment is proper where the pleadings, discovery, and affidavits show that

there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In a typical summary judgment motion, a defendant moves for judgment against a plaintiff on the merits of his claim. In such a situation, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *See id.* at 631.

<strong>Analysis</strong>

Plaintiffs' claims that defendants failed to protect them from attack by the Fresno Bulldogs, and in fact knowingly placed them at risk of such an attack, are evaluated under the Eighth Amendment.

**A.      Eighth Amendment Violation**

The "'treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The Eighth Amendment requires prison officials to "ensure that inmates receive adequate

4

food, clothing, shelter, and medical care," and to "'take reasonable measures to guarantee the safety of the inmates.'" *Id.* A prison official violates the Eighth Amendment when two requirements are met: (1) the deprivation alleged must be, objectively, sufficiently serious, *Farmer*, 511 U.S. at 834 (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)), and (2) the prison official possesses a sufficiently culpable state of mind, i.e., the offending conduct was wanton, *id.* (citing *Wilson*, 501 U.S. at 297).

The failure of prison officials to protect inmates from attacks by other inmates or from dangerous conditions at the prison violates the Eighth Amendment when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious; and (2) the prison official is, subjectively, deliberately indifferent to inmate health or safety. *Farmer*, 511 U.S. at 834. A prison official is deliberately indifferent if he knows of and disregards an excessive risk to inmate health or safety by failing to take reasonable steps to abate it. *Id.* at 837.

> For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

*Id.* at 842–43 (quoting a litigant's argument).

It is well-settled that a "generalized" fear or risk of violence will not support a failure-to-protect claim. *See Williams v. Wood*, 223 F. App'x 670, 671 (9th Cir. 2007) (concluding that district court properly dismissed the plaintiff's claims because his "speculative and generalized fears of harm at the hands of other prisoners do not rise to a sufficiently substantial risk of serious harm"); *Turner v. Bunn*, 107 F.3d 17 (9th Cir. 1997) (unpublished) ("Plaintiff expressed only a general fear of harm by other inmates and failed to create a genuine issue of triable fact as to the risk of serious harm."). Here, however, defendants were presented with more than a generalized risk or fear. Rather, the anonymous caller identified the date on which violence would occur (May 25, 2021, during yard time), who would perpetrate the violence (the Fresno Bulldogs), and the intended victims of the violence (inmates who were neither Black nor Asian). *See* Dkt. No. 40-1.

5

This suggests that CTF officials "had been exposed to information concerning the risk" which came to fruition, "and thus 'must have known' about it." *Farmer*, 511 U.S. at 842. *See, e.g.*, *Sernas v. Cantrell*, 857 F. App'x 400, (Mem)–401 (9th Cir. 2021) (concluding, where plaintiff had informed defendant-officials of threats to his life if returned to his housing unit and was assaulted within fifteen minutes of defendant-officials' returning him to that housing unit, that "the allegations … support a plausible inference that these defendants were both 'aware of facts from which the inference could be drawn that a substantial risk of harm exists,' and 'also [drew] the inference'") (quoting *Farmer*, 511 U.S. at 837).

Defendants do not argue that the risked harm—injury from a riot—was insufficiently serious to implicate the Eighth Amendment. *See generally* Falcon MSJ, Serrato MSJ, Perez MSJ. Rather, defendants argue they lacked the knowledge necessary to be liable for deliberate indifference.

In *Falcon*, defendants initially argued they had no knowledge that a riot would occur and suggested they had not received an anonymous tip the day before the riot. *See generally* MSJ; *see e..g.,* Dkt. No. 35-4 ("Koenig Declaration") at ¶¶ 10–15 (stating defendant Koenig had not received advanced notice of the riot). For the first time in their reply, defendants disclosed evidence that a tip had been received. Dkt. No. 40 at 3. The lack of knowledge on which defendants' summary judgment arguments turn is thus in question. *Cf.* Koenig Decl. at ¶ 15 ("I am not aware of any staff that received advanced notice of the May 25, 2021 riot from any source, directly or indirectly.").

In their replies, defendants shift approaches and argue that they investigated the tip and concluded that it was not credible. Reply at 3–4; *Serrato* MSJ at 12 ("Defendants have provided undisputed evidence that CTF staff fully investigated the anonymous tip that was provided on May 24, 2021, and were unable to find any credible evidence to corroborate a risk of violence."). But there is no evidence in the record to suggest any defendant asked any Fresno Bulldog about the alleged attack plan after receiving the tip. Rather, defendants' investigation consisted of reciting that the Bulldogs' leadership committee were interviewed four hours *before* the tip came and that the committee "did not foresee any issues" with the planned yard release. *See* Dkt. No.

United States District Court
Northern District of California

40-1. Defendants do not represent that any officer re-interviewed the Bulldog leaders after receiving the tip, nor that the discrepancy between the tip's information and the Bulldog leadership's expectations was ever addressed. That the Bulldog leaders had earlier disavowed other issues thus does not appear to foreclose defendants' having been deliberately indifferent to plaintiffs' right to be protected from harm at the hands of other inmates. *See Davis v. Scott*, 94 F.3d 444, 446 (8th Cir. 1996) ("The Supreme Court has cautioned, however, that . . . a prison official would not necessarily escape liability just because he could not verify a particular risk, if he strongly suspected the risk to exist.").

Finally, defendants argue that they could not restrict the right of non-STG-affiliated prisoners to access the yard without violating those prisoners' constitutional rights. *See Perez* MSJ at 17–18. This argument ignores that CTF officials could have restricted the Fresno Bulldogs' yard access while they investigated a tip that the Fresno Bulldogs planned to attack other inmates.

For these reasons, there appears to be a triable issue of fact as to whether defendants were subjectively deliberately indifferent to the risk that plaintiffs would be attacked by the Fresno Bulldogs on May 25, 2021.

## B.    Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The rule of "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Defendants argue that they are entitled to qualified immunity because "[i]t was not clearly established that investigating an anonymous tip and determining it was not credible would result in a constitutional violation." *Serrato* MSJ at 15. As explained above, however, the evidence would permit a jury to conclude that defendants did *not* investigate the anonymous tip. Defendants' own facts show that they did not follow up with any Fresno Bulldog regarding the tip, and defendants do not identify any actions they took to corroborate or to disprove the tip. Rather,

defendants decided the tip was not credible based on a meeting held four hours before the tip was received. This "plainly incompetent" failure to investigate is not entitled to the shield of qualified immunity. *Saucier*, 533 U.S. at 202.

### CONCLUSION

Defendants' motions for summary judgment are **DENIED**. *See* Dkt. No. 35; *Serrato* Dkt. No. 50; *Perez* Dkt. No. 35. Mr. Falcon's motion to file a sur-reply is **GRANTED** and his sur-reply was considered herein. Dkt. No. 42.

This action is referred to Magistrate Judge Illman for mediation or settlement proceedings pursuant to the Pro Se Prisoner Mediation Program. The Clerk shall send a copy of this order to Magistrate Judge Illman.

**IT IS SO ORDERED.**

Dated: March 20, 2026

P. Casey Pitts
United States District Judge

United States District Court
Northern District of California

8